**CATAPHOTE CORPORATION,**
**Plaintiff-Appellant,**

v.

**Cecil W. HUDSON and Hudson Industries, Inc., Defendants-Appellees.**

**No. 27947.**

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1970.

---

L. Arnold Pyle, Jackson, Miss., William A. Marshall, Chicago, Ill., for appellant.

Robert W. King, Jackson, Miss., for appellees.

Before JONES, BELL and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This is a trade secret case based on diversity jurisdiction. Cataphote sued Hudson and Hudson Industries, Inc. seeking to enjoin them from utilizing designs, techniques and equipment the knowledge of which allegedly was acquired by Hudson while employed by Cataphote. The District Court, sitting without a jury, found for the defendants. We vacate the judgment and remand for new findings of fact and conclusions of law.

Cataphote is engaged in the manufacture of glass beads of microscopic size. Hudson is a skilled mechanic with inventive talent and a native ability to design and manufacture devices which he wants or needs. When Hudson was employed by Cataphote in 1950 that company was struggling by trial and error to devise a plant for the profitable manufacture of glass beads in commercial quantities.

Previously Hudson had many years of machine shop experience with other employers. For four years he had been employed by a glass company in designing, making, installing and maintaining machines for the making of glass, burners for glass-making furnaces, and crushing equipment. He also worked with gas, gas regulators and mixing valves. But he had no prior experience in making glass beads.

Hudson worked with Cataphote as a trusted employee. In part through his efforts, a successful gas-fired furnace was devised for making glass beads of the desired size. Subsequently Hudson became plant manager of Cataphote's glass bead making facility at Jackson, Mississippi, where the furnace was used. He remained in that capacity for eight years.

The manufacture of glass beads is not a protected art. Several different methods are economically feasible, and several companies in the United States are engaged in the business. Patents relating to processes and devices for manufacturing glass beads have expired and are in the public domain.

Hudson left Cataphote in 1958. At no time had he agreed not to use trade secrets of Cataphote or agreed not to compete. Such duties as he may have relating to Cataphote's processes and equipment come not from express contract but from the implied contract springing from his confidential relationship to Cataphote.

After seven years in unrelated industries Hudson organized Hudson Industries, Inc., of which he is principal stockholder and chief executive officer. He set about to construct for this company a furnace for the manufacture of microscopic glass beads in competition with Cataphote. Before construction was completed Cataphote sued for, and was granted, a temporary injunction. After hearing the court dissolved the injunction and treated the case as one for declaratory judgment. The court directed Hudson to file, 30 days before his plant was put into operation, a report revealing in detail the processes and procedure to be used in the plant. The District Court retained jurisdiction but designated the order to be final and appealable under Fed.R.Civ.P. 54(b). No appeal was taken. We discuss below the differing views of the effect of this order.

The defendants completed their plant and filed a report with the court. Cataphote asserted that certain trade secrets were violated by the plant as constructed. After a hearing on the merits the District Court held that Cataphote had failed to establish that its claimed trade secrets qualified as such and that the Hudson equipment and techniques were not mechanical equivalents but substantially dissimilar and that the defendants should not be barred from using their plant.

■ It seems to us, though we cannot say with complete assurance, that the trial court may have employed a partially incorrect standard in determining if the equipment, techniques and processes claimed to be trade secrets actually were trade secrets.[1] In its opinion the court referred to a contention by Hudson that the claims of Cataphote "do not qualify as trade secrets in being so unique as to be unknown in the trade." Hudson, and the court, cited Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336 (7th Cir. 1966), a patent case. As we point out below, the standards giving rise to protectibility are different for patents than for trade secrets. And, while knowledge in the trade is an important area of inquiry, uniqueness in the patent law sense is not an essential element of a trade secret.

After considering each of the claimed secrets the trial court concluded that "plaintiff has not convinced the court that its techniques and apparatus are in any way unique or novel. To qualify as trade secrets, they must have elements of uniqueness as to amount to discovery." In its judgment entry the court decreed that "the Plaintiff has failed to establish that its claimed trade secrets are sufficiently novel or unique to qualify as trade secrets."

■ Consideration of the trial court's language requires comparison of trade secrets and patents and the requirements of each.

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

* * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

Water Services, Inc., v. Tesco Chemicals, Inc., 410 F.2d 163, 171 (5th Cir. 1969), quoting from Restatement of Torts (1939) § 757, Comment b, p. 5. The patent laws establish a monopoly for the purpose of encouraging invention and the arts. Protection of trade secrets is a form of protection against use by others, focusing upon inequitable use by another—by breach of contract not to reveal, or abuse of confidence, or impropriety in obtaining the secret. Restatement, *supra*, § 757, Comment a, p. 4; Developments—Competitive Torts, 77 Harv.Law Rev. 888, 948 (1964). The patent is totally exclusionary for the period for which granted. The trade secret is protected only so long as competitors fail to duplicate it by legitimate, independent research. *Water Services, Inc., supra.* The trade secret is protected by being kept secret. The patent is protected after being spread on the public records for all to see.

■ The subject matter of a trade secret must be secret. An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret.[2]

"As distinguished from a patent, a trade secret need not be essentially new, novel or unique." 2 Callman, Unfair Competition, Trademarks and Monopolies (3rd ed., 1968) § 52.1, p. 373. "Novelty and invention are not requisite for a trade secret as they are for

---

1. It is unnecessary for us to set out the several aspects of the court's standard which are accepted by the parties as correct.

2. Of course, we do not exclude the possibility that a non-secret item may become the subject of a process not theretofore generally known and therefore secret.

patentability.[3] These requirements are essential to patentability because a patent protects against unlicensed use of the patented device or process even by one who discovers it properly through independent research. The patent monopoly is a reward to the inventor. But such is not the case with a trade secret. Its protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes or devices. The protection is merely against breach of faith and reprehensible means of learning another's secret. For this limited protection it is not appropriate to require also the kind of novelty and invention which is a requisite of patentability." Restatement, *supra*, § 757, Comment b, pp. 6–7. This Circuit, in a case governed by Georgia law, and making an *Erie* guess, has rejected the requirement of "novelty." Water Services, Inc., v. Tesco Chemicals, Inc., *supra*. See also, 77 Harv.L.Rev. at 949, rejecting the necessity of "novelty" in the sense of "a substantial advance over prior knowledge." We make the same *Erie* guess as to Mississippi.[4]

If the District Court considered uniqueness and novelty as conditions precedent to existence of Cataphote trade secrets, we think it erred.[5] Despite the foregoing, the decision below would be due to be affirmed if the District Court had held, under appropriate standards, that the matters claimed to be trade secrets were not being utilized by defendants, or, if utilized, that the use by defendants was not an illegal appropriation. Its holdings in this respect are not entirely clear. In discussing this issue the court held "that Hudson is using a furnace of different measurements to which he has applied his skill and knowledge in working out the process and equipment he deems most adaptable to it and which are different from those of Cataphote." Earlier in its opinion the court had noted, "although Hudson's techniques and apparatus bear some similarities to those of Cataphote, there are * * * decided dissimilarities." In its judgment entry the court decreed that "the Hudson equipment and techniques are not mechanical equivalents of the Cataphote technique but that both are substantially dissimilar."

■■■■■ Several factors are involved. In the purely mechanical sense, the fact that measurements are different is not necessarily determinative. To be subjected to liability one need not use the secret in exactly the form in which he received it, and he may be liable for using it with modifications or improve-

3. Though it need not do so, a trade secret may possess qualities of novelty or inventiveness but not rise to the level of patentable invention. Or the trade secret may be patentable and the owner seek to protect it as a trade secret rather than spread it on the records as a patent.

4. Most of the Mississippi cases are concerned with covenants not to compete, and, insofar as they involve trade secrets, the subject matter often has been customer lists and files of accumulated data. *E. g.*, Bagwell v. H. B. Wellborn and Co., 247 Miss. 564, 156 So.2d 739 (Miss. 1963); Donahoe v. Tatum, 242 Miss. 253, 134 So.2d 442 (1961); Sivley v. Cramer, 105 Miss. 13, 61 So. 643 (Miss. 1913). Where secrets are of this nature, novelty, in the sense of an advancement of knowledge, really is not involved. Nevertheless, the Mississippi Supreme Court in this series of cases has taken the approach of a careful balancing of interests of the business, the situation and objectives of the parties, the necessity of protecting the legitimate interests of employer and employee, and the possibility of adverse effect on the public. When the focus is on the relationship of the parties, and the effect thereof, the qualities of uniqueness or inventiveness of the subject matter are of diminished importance.

5. Also, the court implied that it was looking at Hudson's processes and equipment, as well as Cataphote's, with an eye to determine if they had qualities of uniqueness. Of course, Hudson may be a non-appropriator with unique techniques and devices of its own, but uniqueness of its techniques and devices, in the patent law sense, is not essential for Hudson to be a non-appropriator.

ments effected by his own efforts. Differences in detail do not preclude liability if substantially the process is derived from the other's secret. Restatement, *supra*, § 757, Comment c, p. 9. The doctrine of equivalents, from the patent law, is useful as an analogy, though no more than that. Bolt Associates, Inc., v. Alpine Geophysical Associates, Inc., 365 F.2d 742, 748 (3rd Cir. 1966). See also, Restatement, *supra*, § 757, Comment c, p. 9.[6] The finding that the process and equipment which Hudson had "worked out" by applying his skill and knowledge, were "different from those of Cataphote" is subject to the same comments.

 The use by Hudson of his "skill and knowledge" is not necessarily determinative that the furnace he has constructed is not violative.

An employee, upon the termination of his employment, is free to draw upon his general knowledge, experience, memory and skill, howsoever gained, provided he does not use, disclose or impinge upon any of the secret processes or business secrets of his former employer. This rather piously oversimplified principle is much easier to state than to apply.

The suggested distinction between general and special knowledge is stated as a moral and economic commandment; but it is an issue which can only be resolved by a balancing of the conflicting social and economic interests of two desirable goals. On the one hand, the law encourages competition and supports an individual's right to exploit his own skill and knowledge; on the other, the law should grant established businesses reasonable protection against unfair trade practices. If both goals cannot be insured, research and development may be impaired for no employer would be willing to risk the required expenditure if its results would be freely available to all his former employees. Conversely, freedom of movement on the part of employees will be unduly restrained and competition fettered, contrary to public interest, if the strictures imposed upon former employees are unduly confining.

2 Callman, *supra*, § 54.2(a), pp. 416–417. Callman discusses at length the interests of employer and employee which must be balanced. *Id.* § 54.2(a), pp. 418–421.[7]

 We must vacate and remand for specific findings and conclusions, under correct standards, of whether Cataphote's claims are in fact trade secrets, and if they are of whether defendants are illegally appropriating them. Whether the District Court wishes to supplement the record with additional evidence is for it to determine.

 Hudson claims that some of the subject matter embraced in the claimed trade secrets was obtained by Cataphote through improper means, and he introduced evidence which he says tends to support that assertion. The District Court made no findings on this matter. Protection of trade secrets is an equitable doctrine. Secrets obtained by wrongful means are not entitled to protection, and the "unclean hands" doc-

---

6. Callman suggests the doctrine of equivalents may be applied only if the secret amounts to a "useful, patentable invention." 2 Callman, *supra*, § 52.1, p. 375.

7. See also, the discussion at 77 Harv.L. Rev. 950–953, pointing out the difficulty of the case in which the technically skilled employee changes jobs, and his skills include information which the employer regards as confidential. The commentator agrees with Callman that a firm and certain rule is unsatisfactory, and suggests several guidelines, inter alia: (1) Agency principles are of little help nor are concepts of "disloyalty." (2) What is the extent of the handicap to the employee in seeking new employment—is his job mobility injured? (3) Has he himself helped to develop the trade secret and was he hired to produce it? (4) Was he given a fair and explicit notice that the work on which his skills were being employed would be claimed to be protected? (5) The duration of the restraint. (6) The effect on the employer's incentive to invest.

trine may apply to deny the employer protection. 2 Callman, *supra*, § 53.2(a), p. 384.

 The District Court correctly decided that the earlier decision of the same court denying a permanent injunction to Cataphote was not the law of the case (or res judicata) establishing that what Cataphote claims at this time to be trade secrets are in fact trade secrets or that Hudson is appropriating them. At that time Cataphote claimed more than fifty secret matters which it said Hudson was violating. The status of the proceeding then was that Hudson was to be allowed to complete his plant, but before he could put it in operation he must report to the court his equipment, processes and techniques. If Cataphote then wished to assert a claim that defendants were violating protected matter Cataphote necessarily would have to identify what the matter—allegedly secret and allegedly violated—was, and the issues thereby precisely framed would be ready to be litigated. That is exactly the orderly and sensible course which the litigation (now reduced to six claimed secrets) has taken.[8]

 The District Judge did not err in concluding that Hudson was not in contempt of an earlier court order by operating his plant temporarily in order to perfect his equipment. He did not abuse his discretion in denying Cataphote the right to use expert witnesses who apparently had been furnished secret information in violation of an order of the court.

Vacated and remanded for further proceedings not inconsistent with this opinion. The clerk will divide the costs equally between the parties.

8. The judge who tried the case on the merits (not the same judge as had entered the earlier judgment) correctly appraised the status of the case when it reached him:

"It is important to note at this stage in the proceedings that it became obvious to this Court to which the case was assigned, as well as to the Judge heretofore presiding, that there could be

no effective restraint against defendants until such time as plaintiff specifically identified and proved its claimed trade secrets to be trade secrets in fact and that they had been adopted or appropriated by defendants. A resolution of this issue necessarily has to be found in a comparison of the two manufacturing processes."